CONTINENTAL LIFE INSURANCE COMPANY *v.* MALOTT, ADMINISTRATRIX.

[No. 13,389.   Filed April 26, 1929.]

H. K. *Cuthbertson*, Albert H. *Cole*, Thomas *Longfellow* and *Condo & Batton*, for appellant.
*Harvey W. Hartley* and *Edgar P. Kling*, for appellee.

NICHOLS, J.—Action brought by appellee in one paragraph of complaint, to recover on a policy of accident insurance $1,500 for the death of her husband.

The errors relied on for reversal are the court's action in overruling appellant's motion to make the complaint more specific; in overruling appellant's demurrer to the complaint; and in overruling appellant's motion for a new trial.

Appellant says that the same and identical questions are involved in this appeal, as to overruling appellant's motion to make the complaint more specific, and as to overruling appellant's demurrer to the complaint, as in *Continental Life Ins. Co. v. Archibald* (1928), 87 Ind. App. 597, 162 N. E. 66, and, relying upon the opinion of this court in that case, appellant does not argue the merits of these alleged errors. We, therefore, go with appellant to the alleged error in overruling the motion for a new trial. It is stipulated in the policy, which is made a part of the complaint, that, in consideration of the payment of the annual premium of $1 appellant insured Basil Malott, now appellee's decedent, and hereinafter called "the insured," for a term of twelve months from the date of the policy, against death or disability resulting directly, independently and exclusively of all other causes against bodily injuries effected solely through external, violent and accidental means and sustained by the insured by the wrecking or disablement of any private horse-drawn vehicle, or motor-driven car, in which the insured is riding or driving, or

by being accidentally thrown from such vehicle or car.

It is averred in the complaint, so far as we need to set it out, that on December 22, 1926, the insured was riding in and driving an automobile to a filling and service station in the town of Amboy, Indiana, for the purpose of refilling the gasoline tank of his said automobile; and, while the gasoline tank of said automobile was being refilled with gasoline, the said tank exploded and said explosion wrecked and disabled said automobile and, by reason of said explosion and wrecking and disabling of his said automobile, the insured was burned so severely that he died on December 24, 1926, from said injuries so received.

Harry Haley's evidence is undisputed. In narrative form, after some correction, grammatically, it was as follows: "I live in Amboy and run a filling station and blacksmith shop; I knew Basil Malott; I recall the accident in December, 1926. At that time Basil drove in there about 8 or 8:10 in the evening; he wanted five gallons of gas and I got up to give it to him, and we were putting the gas in the car and the first thing we knew, flames came right out of the fill plug, it looked like. I thought of the little boy in there and ran around under the hose to get the boy from the opposite side. When I got around there, he had thrown the hose out and grabbed the boy and got out of the cab on the other side, had run out there just south of the station in the driveway and had the boy on the ground rolling him. I ran inside and got a piece of carpet and ran out and told him to let me have him; he got up then and I never saw any fire on him; I saw it on the boy but none on him. I put the carpet over the boy and thought I had the flames out, and then I heard Basil halloo; he was out in the road and there were flames from the bottom of his feet up over his head. I went to him and said 'Lie down'; I took the carpet with me but it wasn't big enough for him; I

couldn't do much with it and then I hallooed for help, and first I knew Wendel Lamb was there with a comforter off the bed. I was down working on him and he was the first man I saw. As quick as he came with the comforter, I jumped up, but during the time I took him by the collar and tore his union-alls and sheep-lined jacket off him and tore his waist to one side. When we put that comforter on him, the flames went out. We didn't see any more flames, but we got him up then and commenced pulling the fire off him, and he didn't have very much clothes left. I can't say there was any explosion; I couldn't say there was a bit of noise; first I knew was just like a blaze will break out. I was standing there holding my hand on the throttle of the pump; I wouldn't say there was a bit of noise. The first I saw was the blaze; the blaze, when I first saw it, was right over the fill plug in the gas tank. I have no idea what caused this, nothing more than I think we ran the tank over. There is no living soul could tell exactly what caused that; the gas caught fire; I couldn't say that there was an explosion. Of course, when gasoline ignites, there is an explosion to it; everybody knows that, but as far as making any noise, I wouldn't say to that. The first I thought of when I saw the fire was that little boy standing in front of the fill plug. The cushions were divided; Basil was sitting on one and the boy on the other. I picked the boy up and set him with his face to the cowl and back to the tank, and this fill plug was right in front (behind?) of that boy, and, as quick as I saw the fire, that boy was on my mind and that was all. The condition of the car immediately after the accident was that the cab was pretty well burned; the wiring, and I judge the steering wheel, were partly burned off. When we went to push it out, the steering wheel was so hot I couldn't hold to it, so I took the wheel next to me; we pushed it out about the end of the drive."

On cross examination, he testified that the insured "had in the cab his boy, himself and a lantern; I didn't hear any explosion at all; the lantern in the cab was behind the boy, and he had on an overcoat that came down pretty well on him and I could see the flame of the lantern: he threw the hose out and took the boy and went out next to the building and I ran in there and got the carpet and covered the boy up; Malott threw the hose out; after I got the boy and wrapped him in a blanket, Malott went out in the road by himself and I heard him halloo and looked up and he was on fire."

On redirect examination, he testified that: "The glass in the cab was not broken out as a result of the accident. I never picked up a piece of glass that big (indicating) by the pumps, but I picked up a piece of glass out of the driveway next morning out where they put the water on the cab; when they put water in the cab, they broke every glass in it; there wasn't a piece of glass an inch square in front of my pumps; the first intimation I had of anything being wrong was the flame at the fill plug of the tank; it was just a flame; I couldn't say just how big; next thing I observed was to get the fire out on the boy; I never saw any fire on Mr. Malott until after I took care of the boy."

We have thus set out the undisputed evidence of this witness at length, that the occurrences at the time of the accident may be clearly before us. There was no explosion of the gasoline tank, and such an explosion did not wreck and disable the car, and thereby injure appellee's decedent. Appellee testified that her husband bought the truck about three months before, paying about $800 for it, complete with the rack and everything, and that it thereafter sold at the sale for $535. Had there been an explosion of the gasoline tank with five gallons of gasoline in it, we may safely remark that there would have been no automobile to sell.

The only evidence that could in any way be said to differ from that of the above was that of witness Lamb who lived across the street from the place of the accident. This witness stated on his examination in chief that there was some explosion of some kind, and this witness said on cross-examination that he did not see or hear anything in connection with the accident until he saw the light from the flames. "The light of the flames on Mr. Malott was the first intimation I had that there was an accident. There was a noise of some kind; I didn't pay any attention to it, then I looked and saw the light. The kind of a noise I heard was just a kind of a thud."

It is apparent that the flame of the lantern fired the gasoline, and that thereby appellee's decedent was burned and the automobile wrecked and disabled. It was not, as in the Archibald case, the wreck of the automobile that injured the insured, and, in this, the case is readily distinguished. As was said in *Wright* v. *Continental Life Ins. Co.* (1928), 146 Wash. 665, 264 Pac. 410, this policy, issued for a minimum premium, expressly limits the right of recovery within very narrow bounds, and the accident must come within those bounds. To the same effect, see *Maryland Casualty Co.* v. *Edgar* (1913), 203 Fed. 656.

Appellee argues the well-established rule that an insurance policy is to be construed liberally for the benefit of the insured, and doubts are to be resolved in his favor, and that as the insurance policy, not an ordinary contract, is drawn by the company, that construction will be adopted which is more favorable to the insured. But in the policy in suit, there is no ambiguity, and the plain terms of the contract must be followed. *Fidelity & Casualty Co.* v. *Teter* (1894), 136 Ind. 672, 36 N. E. 283.

It was error to refuse to give appellant's instruction No. 1, which would have instructed the jury to find for

appellant. Having reached this conclusion, we do not need to discuss other errors presented.

Reversed.